1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SALVADOR GUZMAN ALVAREZ, | ) | 1:08-cv-01938-AWI-JMD-HC |
| | ) | |
| Petitioner, | ) | FINDINGS AND RECOMMENDATION |
| | ) | REGARDING PETITION FOR WRIT OF |
| v. | ) | HABEAS CORPUS |
| | ) | |
| PEOPLE OF THE STATE OF | ) | |
| CALIFORNIA, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | OBJECTIONS DUE WITHIN THIRTY DAYS |

        Petitioner Salvador Guzman Alvarez ("Petitioner") is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

### Procedural History

        On March 15, 2006, a jury convicted Petitioner of first degree murder and robbery.  (Pet. at 1).  The jury also found true the allegations that Petitioner carried out his crime in furtherance of a criminal street gang and had personally used a firearm in the commission of the offense.  (Id.).

        The California Court of Appeal affirmed Petitioner's conviction and sentence on November 16, 2007.  (Lod. Doc. 4).  Petitioner filed a petition for review before the California Supreme Court that was denied on February 20, 2008.  (Lod. Doc. 6).

        Petitioner filed the instant federal petition for writ of habeas corpus on December 5, 2008.  (Doc. 1).  Respondent filed an answer to the petition on May 4, 2009.  (Doc. 16).  Petitioner filed a traverse on June 9, 2009.  (Doc. 20).

# Factual Background[1]

**Thursday, May 15, 2003**

On the afternoon of Thursday, May 15, 2003, Lopez met with Susan Bockoven to discuss installing a patio at her house. Lopez told Bockoven he was very short of a work crew, and he had been hiring day laborers off the street to work on his projects. Lopez said he planned to hire some day laborers the next morning so he could begin work on her patio. Bockoven expressed concerns about Lopez's safety in hiring people off the street. Lopez assured her that he would only talk to a prospective laborer through his truck window; if he felt comfortable, he would invite the person into his truck, take him to a restaurant, and buy breakfast so the person would trust that Lopez would pay him for his work. However, Lopez also said he was afraid that workers from a rival company might harm him, and a former employee threatened him and was trying to steal his concrete equipment. Bockoven noticed the custom stereo system inside Lopez's truck. She also noticed the inside of his truck was not messy, but fairly tidy and organized. Lopez left her house around 4:30 p.m., and said he would be back in the morning to start her patio.

Joyce Davis and her husband lived on Dezzani Lane in Modesto with their daughter, Shannon, and their son, Trevor. Joyce testified she had met Lopez through a mutual friend, Ali Moore. Around 6:00 p.m. on May 15, 2003, Lopez arrived at the Davis house and visited with Joyce. They ate ice cream in the kitchen, and Lopez indicated he was interested in dating her daughter. Lopez left the Davis house around 7:00 p.m.

Lopez was dating Cristy Benavidez at that time, and he told Benavidez that he was concerned a former employee might steal his work tools. Lopez and Benavidez spent part of the evening of May 15, 2003, together at Lopez's house, with Lopez's daughter and mother. Benavidez left Lopez's house just as it was getting dark outside, around 9:30 p.m. She drove to her home in her own car while Lopez followed in his black truck. They talked on their cell phones during the drive, and she heard his stereo in the background. When they arrived at Benavidez's house, Lopez asked if he could spend the night. Benavidez said no because they both had to work the next day. Benavidez reminded Lopez that his daughter was at his house, told him to go home, and promised to spend the weekend with him. Lopez agreed and said he was going home to his daughter. Benavidez later called Lopez's house and spoke to his mother, who said that he had arrived home. Benavidez briefly spoke to Lopez and he said he was going to bed.

**Thursday Night at the Davis house**

Around 10:00 p.m. Joyce Davis left her house and went to Wal-Mart with her son's friend, Daniel Davis. Around 11:00 p.m., Lopez arrived at the Davis house, parked his truck in front of the house, and was met by Trevor, who said the others were not home. Lopez said he would wait for Joyce and Shannon. Trevor and Lopez talked in the kitchen while Lopez waited. Lopez told Trevor he owned a concrete company and offered Trevor a job laying concrete. Trevor declined because he was working in a cabinet shop.

Joyce and Daniel returned to the Davis house around midnight, and they were met at the front door by Trevor and Lopez. Joyce noticed Lopez's truck was parked in front

---

[1] The Court adopts the California Court of Appeal's summary of the facts. *People v. Alvarez*, 2007 Cal. App. Unpub. LEXIS 9219 (Cal. Ct. App. 2007).

of the house. Lopez told Joyce that he had just met Trevor and offered him a job. Joyce believed Lopez had returned to her house because he was interested in her daughter. Joyce admonished Lopez that Shannon was only 19 years old and too young for him.

Joyce testified that while Lopez was at her house, appellant arrived in a car with two girls and two boys. Joyce testified that appellant and his associates had been to a party, and appellant appeared drunk. Appellant walked around Lopez's truck and looked at it, and then went into the backyard to join Trevor and the others. Joyce testified Lopez became nervous when appellant checked out his truck, but Trevor assured him everything was okay and appellant was "'cool.'" Joyce and Lopez talked for a couple of minutes, and then Lopez went into the backyard with the others. Joyce later joined them in the garage and backyard. Joyce testified they were smoking and she was not aware of anyone using drugs. Joyce denied that anyone furnished Lopez with methamphetamine, or that her residence was known as a drug house. Joyce testified the two girls and two boys left in their car, but appellant stayed at her house.

Shannon Davis testified that she arrived at her house between midnight and 1:00 a.m., and found Lopez and her mother talking in the kitchen. Shannon had noticed Lopez's black truck parked in front of her house. Shannon's brother, Trevor, was in the garage with Daniel and appellant, along with two girls and another boy. Shannon testified she had seen Lopez earlier that day, around 3:00 p.m., at the home of their mutual friend, Ali, and she had declined his offer of a ride home because she did not know him very well.

Shannon testified that as soon as she arrived home at 1:00 a.m., she used the cordless telephone and had a lengthy and heated conversation with her ex-boyfriend. She eventually moved outside to the front porch as she continued the call. She had no idea what was going on in the garage or backyard.

Trevor testified he had known appellant since they were in high school together in 1998, they were pretty good friends, and he referred to appellant as "a homeboy of mine." Trevor testified appellant arrived at his house with some girls and boys he did not know. Trevor testified appellant did not appear drunk. Trevor testified Lopez was "paranoid" when appellant and his friends arrived because Lopez thought they were going to steal his truck. Trevor assured Lopez that appellant and the others were there to visit, and they were not going to steal his truck. Trevor testified they went into the garage and "were just kicking back." Trevor was not aware if drugs were being used that night, but "[t]hey could have been."

Trevor later told a police officer that as the evening continued, appellant showed a "high interest" in Lopez and asked the others if he had family, what he did for a living, if he had money, and did he own the truck. Trevor also told the police that appellant displayed a .380-caliber handgun to the others while they were in the garage. Appellant asked Trevor if he had any bullets for that gun, but Trevor did not have any ammunition.

At trial, however, Trevor testified Daniel Davis showed off a small black and silver .380 or .25-caliber handgun and asked Trevor for some bullets. Trevor denied that appellant displayed the gun, and insisted he never saw appellant holding the gun. Trevor believed Lopez did not see Daniel with the gun.

At the time of trial, Trevor was in custody after being convicted of possession of a deadly weapon in December 2005, and testified under a grant of immunity. Trevor had prior convictions for possession of ammunition in 2005, felony receiving stolen

property, and felony possession of methamphetamine in 2004. Trevor testified he associated with the Norteno gang, he knew members of the Nortenos, he did not know any Surenos, and he was housed with the Nortenos while he was in prison. Trevor admitted his girlfriend was now living with Daniel Davis, but he was not "tripping off of that. I got my other lady. I have a different baby's mom."

Daniel Davis testified he was friends with Trevor and appellant. Daniel lived down the street from Trevor, and he often hung out at Trevor's house to kick back and use methamphetamine. Daniel testified everyone bought and used drugs at the Davis house, including Trevor, Joyce, and Shannon, and he frequently saw appellant use drugs there. The police later received information that Joyce's house was a drug house.

Daniel testified he used to buy and sell guns for a profit. A couple of weeks before the homicide, he bought a .380-caliber handgun for $ 200, and sold it to appellant for $ 250. Daniel used to claim association with the Deep South Side Northern. As of May 2003, however, he was a "dropout Northerner" and no longer associated with them. At the time of trial, Daniel was in prison for attempted statutory rape, and testified under a grant of immunity.

Daniel testified that he was at Trevor's house on the evening of May 15, 2003. Appellant and Lopez were also there, and he saw Lopez's truck. Daniel testified Lopez offered jobs to Daniel and appellant, but he was not sure what kind of work was involved. Daniel thought Lopez was a cool guy, and he was sure Lopez was using drugs that night.

Daniel testified that appellant did not display a gun that night. However, appellant told Daniel he was going to "jack" Lopez, meaning that he was going to rob him. Lopez was around when appellant made this statement, but Daniel did not think Lopez heard it.

Joyce testified that around 3:00 a.m., she went into the backyard and told everyone to leave. Daniel left and walked home. Appellant and Lopez remained at the house. Joyce asked appellant how he was going to get home since his friends had left in the car. Appellant said he would walk. Joyce testified appellant asked Lopez for a ride, and Lopez seemed a little bit concerned because he did not know appellant. Joyce told appellant that she knew appellant and not to worry. Joyce testified appellant and Lopez left the backyard together, but Joyce did not know whether appellant got into Lopez's truck. Joyce believed everyone left around 3:30 a.m. Trevor remained at the house and Joyce went to bed.

Shannon testified she was still on the front porch, talking to her ex-boyfriend on the telephone, when she saw appellant and Lopez leave together. Shannon testified Lopez entered the driver's side of his black truck, appellant entered the passenger side, and the truck drove away. Shannon only saw appellant and Lopez get in the truck.

Trevor testified he went to bed when his mother told everyone to leave, and he did not see the others leave. Daniel testified appellant and Lopez left the Davis house together. [3]

FOOTNOTES

[3] Detective Bunch testified that during the course of trial, he overheard a conversation between appellant and Daniel Davis, and appellant told Daniel "to take the Fifth and

don't let him down." Trevor was within earshot of that conversation. Daniel denied appellant made that statement to him.

END FOOTNOTES

**Appellant and His Neighborhood**

Appellant lived on Mt. McKinley Court in Modesto, just around the corner from the apartment complex on Algen, where Lopez's body was found. Emanuel Perez also lived on Mt. McKinley Court, next to his cousin, David Anguiano, and across the street from appellant. Perez testified [4] everyone in the neighborhood hung out at appellant's house. Perez testified appellant and Anguiano associated with the Deep South Side Modesto gang, also known as DSSM. Perez did not claim an association with DSSM but had friends in that gang.

FOOTNOTES

[4] In exchange for his trial testimony, Perez accepted a plea to have a burglary charge reduced to receiving stolen property, possibly to a misdemeanor, and that he would serve 60 days in jail and two years on probation.

ENDNOTES

David Anguiano testified he was friends with appellant and they hung out together. He knew appellant as "Chava." Anguiano saw guns at appellant's house, including a .380-caliber handgun. Anguiano testified he started to associate with the Norteno gang when he was 15 years old, and appellant also started his association with the Nortenos when he was the same age. Anguiano had prior juvenile petitions for attempted grand theft, robbery, and being a gang member. Anguiano testified "DSSM" meant "Deep South Side Modesto," and "G-14" meant the Norteno gang.

Angela Crum lived next to appellant on Mt. McKinley Court, which was a neighborhood just off Crows Landing Road. The Algen apartments were behind the joint back fences of appellant and Crum. She knew appellant as "Chava." Crum had lived there for 15 years, and appellant lived next to her for five years.

Crum testified the area used to be "a lovely neighborhood" but then appellant moved in and she became fearful of her neighbors. Crum testified that "DSSM" graffiti was all over the neighborhood, on sidewalks, in the streets, on walls and street signs. Appellant told her it meant "Deep South Side Modesto." Crum was also familiar with "G-14" graffiti and testified it was "everywhere." Appellant told Crum that "G" meant gangster, and "14" meant "N," the 14th letter of the alphabet. Crum saw appellant and David Anguiano carve "DSSM" in the tree in front of appellant's house, and testified "[t]hey wrote it all the time."

Crum testified that she had seen appellant with a gun on 10 or more occasions. On one occasion, she was throwing out the garbage at her house when appellant, David Anguiano, and two other men drove by. They were all holding guns, they told her to get down, and the car drove on, but they did not fire at her.

Joshua Allan lived near appellant, on the corner of Algen and Mt. McKinley Court. He moved into the neighborhood about two months before the homicide. Allen testified he figured out appellant was associated with a gang because appellant's brothers and friends wore red shirts, and someone performed a drive-by shooting and

fired a .22-caliber slug into Allan's new truck. Allan never saw appellant wearing a red shirt.

**The Homicide**

Francisco Castro lived in the apartment complex at 201 Algen. Sometime between 4:30 a.m. and 5:00 a.m. on Friday, May 16, 2003, he awoke to the sound of two gunshots. Castro stayed in bed for a few minutes, then got up to get ready for his day. While he was in the kitchen, he heard the police and other personnel arrive.

Toribio Sanchez also lived in the apartment complex. He was in the bathroom when he heard a single gunshot, possibly around 3:30 a.m. He looked outside and did not see anything. About five minutes later, he looked out again and saw a large blue or black Ford truck driving away from the apartment complex, but it was too dark to see who was driving it.

Angela Crum, who lived next door to appellant on Mt. McKinley Avenue, was in bed when she heard two gunshots sometime between 3:00 a.m. and 4:00 a.m. The two shots were fired four to five seconds apart, and sounded like they came from the Algen apartment complex. About three minutes after the shots, Crum looked out her window, where she could see appellant's back fence which bordered the apartment complex. There was a light in Crum's backyard, and Crum saw appellant and another young man jump over appellant's backyard fence. Appellant jumped first, followed by the other man. She could not see the other man's face, and she could not see if either man was carrying anything in his hands.

Vicente Duarte Rivas lived in the Algen apartment complex. Sometime between 4:40 a.m. and 4:45 a.m., he was walking to his car to go to work. Rivas saw a body on the ground, partially underneath a parked car. Rivas walked up to the body and noticed blood, and thought the man was dead. Rivas contacted a neighbor who called the police.

Around 5:00 a.m., Modesto Police Sergeant David Chamberlain responded to a dispatch of an unresponsive man lying on the ground at the apartment complex. Sergeant Chamberlin saw a man lying on his stomach in a pool of blood, and discovered Lopez's body. He had been shot twice in the head and did not have a pulse. The police had to confirm Lopez's identity through fingerprints because his face was too bloody at the scene to match his driver's license photograph. Lopez's black truck was in the apartment's parking lot. Vicente Rivas advised the police that the black truck did not belong in the apartment complex. The truck's engine was warm to the touch, the keys were in the ignition, and the stereo was missing. The police immediately taped-off the area as a crime scene.

**The Forensic Investigation**

Detective Rudy Skultety, the crime scene manager, found a large pool of blood about 10 to 15 feet from Lopez's body, with drag marks leading from the blood pool to Lopez's body. There was a small metal fragment under the body, possibly the metal jacket from one of the bullets. There was a bloody shoe impression on the driver's side step-rail of Lopez's truck. There were footprints in the blood, as if someone had stepped in and out of the vehicle. There were blood splatters inside the truck, the majority of which was on the driver's door, specifically on the driver's side left rear window, on the front dash, and the driver's door side post. There was blood in the area exposed by an open driver's door, and only could have been there if that door was open. There were tire tracks leading from the pool of blood, along with blood splatters

under the truck's right rear side and panel, and on the tail pipe, which indicated the truck had been driven out of the parking lot after the homicide.

Lopez's wallet was on the truck's front seat, but the truck's interior cab was in disarray and appeared to have been ransacked. Lopez's business cards and papers were scattered inside the cab. The stereo/CD player had been pulled out of the dashboard and the wires were dangling. The driver's side outside mirror was broken.

The investigators found two Winchester .380 shell casings inside the truck: one was next to the weather stripping on the floorboard, and the other was between the back seats. A criminalist determined the two casings were fired from the same firearm. A yellow-jacketed bullet was found directly under the driver's seat. A criminalist determined that bullet was most likely a .380-auto projectile.

Based on the crime scene evidence, Detective Skultety believed Lopez had been shot inside the truck while he was in the driver's seat, by someone sitting in the passenger seat. Lopez's body was removed from the truck through the driver's door, dragged out, and left in the parking lot. Detective Skultety believed Lopez's body was dragged from that initial location to the spot where the police found it. He also believed Lopez's truck was driven out of the apartment complex's parking lot, then returned to the parking lot and parked where the police found it.

The autopsy revealed that Lopez died from two gunshot wounds to the face. One bullet entered the right side of Lopez's cheek and traveled to his brain, slightly upward and toward the left; that bullet was recovered from his head. The other bullet entered the right check, traveled across his face, and exited the left side of his face, slightly downward and toward the rear; that bullet was likely the one found under the driver's seat of the truck. Both shots were almost contact wounds, fired at close range, and both were fatal. There were bruises on Lopez's forehead and cheek, and small abrasions and a minor cut on his body, all of which were consistent with falling and being dragged on concrete, or resulting from a minor scuffle. Lopez suffered the abrasions after he was shot, as he was in the process of dying.

The autopsy further revealed that Lopez was under the influence of methamphetamine when he died, and had used the drug a few hours before his death. The toxicology results determined the amount of methamphetamine was .31 milligrams per liter, considered a very high level.

Detective Buehler testified that based on the casings recovered from the homicide scene, he believed the fatal bullets were Wincester .380-caliber ammunition. Buehler had never seen that particular type of ammunition and determined it was usually used in indoor ranges.

**Appellant's Statements after the Homicide**

Around 5:30 a.m. on May 16, 2003, Angela Crum's husband arrived home from work and told her about the crime scene at the Algen apartments. Crum walked to the corner and saw the police investigation at the apartments. Crum then walked to appellant's house because "[t]hey know everything," and "[w]hatever happens in the 'hood, they knew what happened." Crum knocked and appellant answered the door. Crum was surprised because he usually slept in, but his hair was wet and he appeared to have gotten out of the shower. He was wearing a T-shirt, jeans, and socks but no shoes. Crum thought the absence of shoes was unusual because appellant always wore white shoes. Crum asked appellant what was going on. Appellant said he would talk to her later, and Crum went home.

Emanuel Perez testified that on the morning of May 16, 2003, his mother told him about the crime scene around the corner at the apartments. Perez walked to the apartment complex with appellant's brother, Josue. They stayed for about 10 minutes and watched the police activity. They then walked to appellant's house and talked to him. Appellant asked Perez to join him in the garage, and appellant showed him a stereo/CD player. Perez testified that appellant said "he had got it from this guy that he just killed, he jacked," meaning he had taken it. Appellant said he met the man at a party, the man gave him a ride, drove him to the apartments, and they parked there. Appellant said "he jacked him for his stuff and then shot and killed" the man inside his truck. Perez did not ask and appellant did not say why he shot and killed the man, but Perez "just kind of figured it was for the stereo." Perez testified he was shocked by what he heard.

Perez testified that a few days later, appellant gave him that same stereo/CD player. Perez kept it in his car for awhile, but he got rid of it because he knew it was stolen and did not want it at his house. Perez gave it to someone he did not even know.

Perez called David Anguiano and said that he felt appellant was involved in the murder. Anguiano later told the police that he knew appellant had purchased a .380-caliber handgun from Daniel Davis. Anguiano also told the police that he went to appellant's house and asked him about the rumors that he was involved. Appellant admitted to Anguiano that he was involved in the murder and he was in the truck with the victim. Appellant said he had been having dreams about "the dead guy." Appellant said he was going to get rid of the handgun. Two weeks after the murder, Anguiano asked appellant about the gun, and appellant said the gun was gone.

Angela Crum continued to talk to appellant about the homicide. The day after the homicide, Crum saw appellant and David Anguiano talking in appellant's driveway. As she walked by, she heard appellant say, "'I don't know what I'm going to do now.'" Two or three days after the homicide, Crum saw appellant and his girlfriend, and asked him what happened. Appellant said, "'Don't worry about it.'"

In the days after the homicide, Crum saw appellant's girlfriend a few times, asked her about the incident, and the girlfriend "told me everything." A few more days later, Crum again saw appellant and his girlfriend, this time in Crum's front yard. Crum asked appellant, "'Did you shoot the gentlemen, man?'" Crum testified appellant said, "'Mother fucker deserved it.'" At some point, appellant told Crum "to keep your mouth shut." Crum testified she was present when appellant bragged to his girlfriend and her sister, who lived in the neighborhood, "'I'm a murderer and they ain't got nothing on me.'" [5]

FOOTNOTES

[5] At the time of trial, Angela Crum had moved to another state because she was frightened to stay in the area after the murder.

END FOOTNOTES

Trevor told the police that after he heard about the homicide, he talked about it with Daniel Davis, and Daniel said he sold the handgun to appellant. Daniel also told Trevor that just before appellant and Lopez left the Davis house that night, appellant said "he was going to jack" Lopez.

Luis Barrera told the police that he lived with appellant's family for two years and moved out in 2002. Barrera said appellant was a Norteno who associated with Deep

South Side Modesto. Barrera said he used to associate with that same set, and he actually brought appellant into the gang. Barrera said that about the time of the homicide, Barrera went to appellant's house for a barbecue but he was not there. Appellant arrived with two unknown Hispanic males, Daniel Davis showed up shortly thereafter, appellant took a shower, and then he left. A few days later, appellant called Barrera and asked "guess what had happened." Barrera asked what happened. Appellant said, "I did some shit." Barrera said appellant was crying and said he was having nightmares with a guy pointing at him holding his head. Appellant said he would not be able to see his family anymore. [6]

FOOTNOTES

[6] Barrera testified at trial that he never had any conversation with appellant and could not remember what he said to the police, and he was impeached with his prior statements.

END FOOTNOTES

**The Search of Appellant's House**

Detective Jon Buehler, the lead detective, did not have any leads in the Lopez homicide. There was no fingerprint or DNA evidence in Lopez's truck (aside from Lopez's own prints), on his body, or the bullet casings found in the truck, to lead the police to any suspects. Buehler contacted the Modesto Bee, and asked the paper to run a newspaper article to ask people with information about the homicide to contact the police. A person came forward who did not want to be identified, but who directed the police to Joyce Davis. Buehler interviewed Joyce, who connected Lopez with appellant, and also led Buehler to Daniel Davis.

Based on the investigation, the police executed a search warrant on June 12, 2003, for appellant's residence on Mt. McKinley Court. Angela Crum was present when the police searched the house, and testified appellant said to her, "'They have nothing on me.'"

During the search, the police found appellant's wallet and personal property in the southeast bedroom. They also found 12 nine-millimeter handgun cartridges, and a bloody shirt in a trashcan in that bedroom. The shirt had appellant's blood on it. In that same southeast bedroom, the police found a notebook containing gang writings with appellant's name, "Chava," written on it.

The officers found the personal property of appellant's brother, Isaac, in another bedroom. In that bedroom, the police found a hole had been punched in the drywall which looked unusual. The police investigated the space in the wall and found five Winchester brand .380-caliber live cartridges with bullets, which had been concealed inside the wall. These were consistent with the .380-caliber cartridges and bullet found inside Lopez's truck, and the bullet retrieved from his body. The officers found a loaded Smith & Wesson nine-millimeter handgun in a garage cabinet. The officers never found the murder weapon.

A tree trunk in front of appellant's house had "RIP," "DSSM," and "209" carved in the bark. "DSSM" was also on the lid of a city trash container at appellant's house. Detective Buehler testified "DSSM" meant "Deep South Side Modesto." There was graffiti all around the sidewalks and area of the apartment complex, including "DSSM," "XIV," "X" and "4."

**Appellant's Interview**

At some point during the search of appellant's house, Detectives Buehler and McGill decided to tell appellant that someone had accused him of committing a crime, without specifying the crime was murder, to determine if appellant was going to cooperate. Detective McGill made contact with appellant, said that someone had accused him of a crime, and asked if he would be willing to speak with a detective about it. Appellant said yes. As Detective McGill walked away from appellant, Sergeant Key heard appellant say, "Yeah, I'd like to go and clear this up and find out who accused me of murder."

Appellant was taken to the police department and interviewed by Detective Buehler. The interview was videotaped and a transcript introduced at trial. Buehler advised appellant of the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, and appellant agreed to talk to him. Buehler advised appellant that he had been accused of being involved in a crime. Appellant said he knew someone accused him of murder. Appellant claimed Detective McGill accused him of murder, but Buehler knew McGill never said the crime was murder. Appellant denied any knowledge or involvement in the murder. Buehler disclosed the victim's name and appellant said he never heard of Rick Lopez. Buehler asked if there was any reason for appellant's fingerprints to be in Lopez's truck. Appellant said no and asked what kind of truck. Buehler said it was green or gray Ford truck. Appellant was pretty positive his prints were not in the truck and he never got in that truck. Buehler said that someone said appellant was in the truck and the victim gave him a ride home, the body was found in his backyard, and another guy said he had bought a gun and used it to rip off the victim. Appellant again said he did not know the guy.

As the interview continued, appellant said he had to look at a photograph to tell if he met the guy. Buehler described Lopez and said he had a green or gray truck. Appellant said he was not sure but "some lady introduced me to him I think" and he might have had a truck like that. Appellant said about four weeks ago, he was at Luis Barrera's house and "the lady introduced me to that guy." "I'm not sure if it's the same guy, but I know this lady introduced me to a man that had a truck like too." Appellant saw that guy once and denied he got a ride from him.

Buehler presented appellant with Lopez's photograph, and appellant said he was "pretty sure" he met him one time. Buehler asked why so many people said appellant left the woman's house with the victim, and appellant said he was telling the truth and he did not trust the lady who introduced them. Buehler said he did not have the fingerprint results yet and appellant's prints could be found in the truck. Buehler asked about the bloody T-shirt in appellant's bedroom, and appellant said he cut himself with a knife while trying to cut wires.

During a break in the interview, Detective McGill brought appellant some lunch. Appellant told McGill that "he had been thinking while we were gone because he was essentially alone in the room, and he said that he believed in things like fingerprints, and if we had such a thing, that we could arrest him."

**Expert Testimony about Gangs**

Froilan Mariscal, an investigator with the district attorney's office, testified as an expert on Modesto area gangs. He had been raised in the area claimed by the Deep South Side Modesto (DSSM) street gang, and received formal training in gang investigations. He was a member of the county-wide Gang Intelligence Task Force, participated in daily briefings on gang activity with Stanislaus County law

enforcement agencies, and with state and federal gang investigators. He was the district attorney's contact person for gang investigations and information, and investigated about 50 gang-related cases. Based on his experience and contacts, Mariscal had knowledge about the life style of gang members, their attire, colors and tattoos, street boundaries, how they made their money, and their structure. He had testified on nine different occasions as an expert on Hispanic street gangs, and the Norteno gang, in Stanislaus County.

Mariscal testified there were at least 1,000 Norteno gang members in Stanislaus County. The Nortenos identified  with several symbols, including "Norte," the number 14 which represented "N," the Roman numeral "X" and "4" together, and one dot next to four dots to mean 14. The Nortenos also identified with the color red and the "huelga bird" used on the "strike flag" displayed by the farmworker labor movement. Mariscal explained that anywhere north of Bakersfield was considered Norteno territory, and south of Bakersfield was rival Sureno territory. There was no specific Sureno turf in Modesto, but most of the Surenos lived on the west side.

Mariscal testified the Modesto Norteno gangs had divided the southern portion of the city into certain areas controlled by DSSM, Barrio Modesto, and Original Gangsters. DSSM was a Norteno gang with territory south of Hatch Road, to Whitmore Avenue, and west of Crows Landing to Carpenter Road. DSSM's primary activities included murder, drive-by shootings, drug sales, witness intimidation, assaults, attempted murders, vehicle thefts, burglaries, robberies and car jackings. DSSM members brag about their criminal activities because they believe the more they are feared, then the more they are respected. They also believe the more they are respected, the higher their status is within the gang, which gained the respect of their own gang members and rivals. They often bragged about their crimes to instill fear and respect in others. They also enjoyed the notoriety when their crimes were reported in the newspaper.

Mariscal testified appellant was an active member of DSSM because he met six of the 10 criteria used to evaluate an individual's status in a gang: appellant was affiliated with other Norteno gang members; he was previously arrested with another Norteno; he had a Norteno tattoo of a dragon with "G14," and the "G" meant gangster; he wore gang attire; he possessed Norteno gang symbols; and he was identified as a Norteno by a reliable source. In July 2002, appellant was arrested on a warrant and for possession of drugs. Appellant was wearing gang attire, a red hat with "LK" on it, and a white and red shirt. "LK" was associated with "Latin Kings," a northern gang which began in Chicago, moved to Southern California, and now had some members in nearby Ceres. Appellant was in a car with Candelario "Gondi" Valdovinos, a validated Norteno member, who was arrested for driving on a suspended license. Appellant was also an associate of DSSM members Manuel Perez and Arturo Iniguez. Manuel Perez and David Anguiano were documented Northern members. Trevor Davis was housed with Northerners while he was in prison.

Mariscal testified that on April 28, 2002, a drive-by shooting occurred between two carloads from rival gangs DSSMs and Surenos. Arturo Lopez, a certified Norteno, was convicted of shooting at an occupied vehicle and being a gang member with a gun. Based on the same incident, a juvenile petition was found true for Federico Parra, a DSSM member, for auto theft for the benefit of a gang. Parra and appellant shared Eric Gomez, a documented Norteno, as a common associate.

Investigator Mariscal testified about the notebook found in the bedroom at appellant's house, which was the same bedroom with appellant's personal belongings and the ammunition. The binder had his name and nickname, "Chava," written on the back, and contained numerous gang symbols and writings, including "DSSM," "X" and "4."

"S" was written and crossed out, which meant a sign of disrespect to the rival Sureno gang. "Chilo," the nickname of appellant's brother, was also written on one page, along with the names of other family members. "Chilo" was written on more of the pages than appellant's nickname. "Mt. McKinley block" was written, with "14" underneath it. There was also the phrase "187 on a scrap," which meant murder on a rival southern gang member, using the derogative name for a Sureno. On another page, appellant's full name was written on the top of a page, with a drawing in red ink of a person wearing a hat backwards, pointing a handgun in a threatening manner. The letters "DSSM" and "TNS" were written on the same page, the latter meaning "tagging nonstop."

Investigator Mariscal testified there were photographs at appellant's house which showed appellant wearing a red T-shirt with a known gang member, with the letters "RIP," meaning "rest in peace," and "G14." Mariscal testified "G" was for "Gondi" Valdovinos, who was killed in a shooting. On the wall of appellant's bedroom, there was a poster for the movie "Scarface," an iconic character for gang members because he sold drugs, killed, and intimidated people. Mariscal testified he had been to the homes of numerous gang members "where they have some sort of picture or something having to do with Scarface and that movie." There was also a red "strike flag" with the huelga bird, a symbol previously used by the farmworker labor movement, which was very popular with the gang members.

Mariscal testified "DSSM" and "209," the local area code, were written on a tree at appellant's house, and "DSSM" was on a trash can at his house. There was also "DSSN" and "X4" graffiti around the Algen apartments. "DSSN" meant Deep South Side Noretnos, which was synonymous with DSSM.

Mariscal testified the firearm and ammunition found inside appellant's house was indicative of appellant's gang association, because gang members commonly use firearms to commit crimes, share their guns, and store various types of ammunition depending on what guns they get.

Mariscal conceded there were no gang signs or symbols at the exact scene of the homicide, but testified to his opinion that the robbery and homicide of Lopez was a murder committed for the promotion and benefit of the DSSM gang. Mariscal testified the crimes benefited appellant because they helped him "by gaining him respect within his own gang and also respect in the eyes of fellow gang members. It also gains the gang respect by the further intimidation and fear they instill upon the community by committing this type of crime." One of the primary activities of the Norteno gang was to intimidate witnesses. As a result of these crimes, "witnesses are reluctant to come forward and testify on this case or any other case involving gang members because of the fear of retaliation. So, in turn, [appellant] would be more likely to--well, it would be harder for us to convict [appellant] without witnesses coming forward." Appellant's crimes would show the rival gangs "that the Nor Tenos are a gang to be reckoned with. It shows them they are capable of--of killing and they gain respect in the eyes of rival gang members."

Mariscal explained Lopez's body was left in the apartment's parking lot, which was an area claimed by DSSM. "So what they're saying is--it's a bold statement saying: We can commit this type of crime in this area because this is ours, we control it, and there's nothing anybody can do about it." Appellant's crimes also promoted further crimes committed by DSSM "by the intimidation that the crime inflicts on the community … or crimes in the future would. Also, probably people would be reluctant to come forward and speak with the police." Mariscal spoke to three other people at the apartment building, and they were all afraid to give statements or

testify. Mariscal conceded that several neighbors testified against appellant, but that witnesses are usually reluctant to come forward in these type of cases.

The prosecutor presented the following hypothetical to Mariscal:

"[Q.] We have--here's a hypothetical. You have an admitted Deep South Side Modesto gang member, sells a gun to a friend of his, and that he's at a house of another person who's now in prison who admits he's a northerner; and the person who's the killer admits to his Deep South Side Modesto buddy before he leaves the house that he's going to jack the guy; and then the victim receives two close range gunshot wounds to the head and his body is dumped in an apartment complex that is right in his territory, not only in Deep South Side Modesto, but really close to Mt. McKinley block; and then items are strung through, and a stereo's stolen and the truck is dropped off four stalls from where the body's left.

"A. I believe it was for the benefit of the northern Nor Tenos criminal street gang."

**Defense Evidence**

Appellant did not testify.

Appellant's brother, Josue Alvarez, testified his mother gave him the nickname of "Chilo" when he was a child.  Josue testified he owned the notebook with the gang drawings found in the house, and it was found in a room he shared with appellant. Josue testified "G14 classified" was a term he borrowed from his late friend, "Gondi" Valdovinos, who adopted the phrase from the movie "Rush Hour." After Gondi died, appellant and other friends got "G14 classified" tattoos in his memory. Josue admitted "X14" was the number of the Nortenos, DSSM meant Deep South Side Modesto, and he wrote those things in the notebook, but he was young and foolish then, and just wrote the things he saw in his neighborhood.

Appellant's mother testified she gave him the nickname "Chava" when he was a child, and also gave nicknames to his siblings when they were children.

Louis Galindez, a private investigator, testified he examined the back fences at the adjoining homes of Angela Crum and appellant, and determined it was not possible for Crum to see the top of the fence bordering the Algen apartments. He conducted this examination in January 2006. Galindez admitted the fence had been rebuilt after the homicide and had new supporting posts. The prosecution introduced rebuttal evidence that appellant's entire fence had been redone since the homicide occurred.

Galindez interviewed Luis Barrera in February 2006, and showed him a copy of the police report with his statements about appellant. Barrera slapped the papers and said, "'[b]ullshit.'" Barrera said he was high on drugs when he made those statements to the police. However, Barrera did not say the contents of the statements were wrong.

(Lod. Doc. 4 at 2-23).

## Discussion

**I.     Jurisdiction and Venue**

A person in custody pursuant to the judgment of a state court may file a petition for a writ of

habeas corpus in the United States district courts if the custody is in violation of the Constitution or

1  laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); *Williams v.*

2  *Taylor*, 529 U.S. 362, 375, n.7 (2000).  Venue for a habeas corpus petition is proper in the judicial

3  district where the prisoner is held in custody.  *See* 28 U.S.C. § 2241(d).

4        Petitioner is currently incarcerated at High Desert State Prison in Susanville, California.

5  As Petitioner asserts that he is being held in violation of his rights under the United States

6  Constitution, and because High Desert State Prison is within the Eastern District of California, the

7  Court has jurisdiction to entertain Petitioner's petition and venue is proper in the Eastern District.  28

8  U.S.C. § 84; 28 U.S.C. § 2241(c)(3).

9  **II.        Standard of Review**

10       Section 2254 "is the exclusive vehicle for a habeas petition by a state prisoner in custody

11 pursuant to a state court judgment."  *Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1126

12 (9th Cir. 2006) (quoting *White  v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir. 2004)).  Under section

13 2254, a petition for habeas corpus may not be granted unless the state court decision denying

14 Petitioner's state habeas petition "was contrary to, or involved an unreasonable application of, clearly

15 established Federal law, as determined by the Supreme Court of the United States," or  "was based

16 on an unreasonable determination of the facts in light of the evidence presented in the State court

17 proceeding." 28 U.S.C. § 2254(d).  "A federal habeas court may not issue the writ simply because

18 that court concludes in its independent judgment that the relevant state-court decision applied clearly

19 established federal law erroneously or incorrectly...rather, that application must be objectively

20 unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (citations omitted).

21 **III.       Petitioner's Claims**

22       Petitioner asserts two claims for relief.[2]  First, Petitioner contends that there was insufficient

23 evidence presented at trial to sustain the jury's verdict with respect to the prosecution's gang

24 allegations.  (Pet. at 8-18).  Second, Petitioner contends he was denied a fair trial due to the trial

25 court's admission of prejudicial evidence concerning Petitioner's gang affiliation.   (Pet. at 19-25).

26 ///

27 _____

28 [2] Petitioner contends that his petition raises three grounds for relief, however, Petitioner's purported third claim for relief
simply restates his first two legal contentions. (*See* Pet. at 26-30).

**A.  Sufficiency of Evidence Claim**

Petitioner contends there was insufficient evidence presented with respect to both the gang special circumstance as to his murder conviction (CAL. PEN. CODE §190.2(a)(22)) and the gang enhancement applied to his robbery conviction (CAL. PEN. CODE § 186.229(b)(1) ).  The California Court of Appeal rejected Petitioner's insufficiency of the evidence claim in the last reasoned opinion provided by the State.

Petitioner's conviction must stand if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Davis v. Woodford*, 333 F.3d 982, 992 (9th Cir. 2003) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  A federal habeas court "faced with a record of historical facts that supports conflicting inferences must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *Id.*

The Court must apply the sufficiency of the evidence standard "with explicit reference to the substantive elements of the criminal offense as defined by state law."  *Id.*  California Penal Code section 190.2, subdivision (a)(22) sets forth the special circumstance which, as applicable to this case, mandates a sentence of life without possibility of parole for a defendant guilty of first degree murder as follows:

> The defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang.

CAL. PEN. CODE 190.2(a)(22).  California Penal Code section 186.22 imposes a sentence enhancement for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang,  with the specific intent to promote, further, or assist in any criminal conduct by gang members."  CAL. PEN. CODE § 186.229(b)(1).  As to the second prong of the enhancement, "specific intent to benefit the gang is not required. What is required is the 'specific intent to promote, further, or assist in any criminal conduct by gang members.'" *E.g., People v. Villalobos*, 145 Cal.App.4th 310, 322 (Cal. Ct. App. 2006).

1   Evidence produced at trial provided strong support for the prosecution's contention that

2   Petitioner was a member of the Deep South Side Modesto (DSSM) gang:  a family friend and

3   member of DSSM testified that Petitioner was a member of DSSM; Petitioner's neighbor testified

4   that she saw Petitioner mark his surroundings with the letters "DSSM;"several witnesses testified

5   that many of Petitioner's associates where DSSM members; police discovered a notebook containing

6   gang writings and Petitioner's name in a room at Petitioner's residence.  (*See* Lod. Doc. 4 at 2-23).   In

7   fact, Petitioner does not appear to contest the notion that he was in fact a DSSM member at the time

8   of his offense.  (*See* Pet. at 9).   Accordingly, the Court must determine if there was sufficient

9   evidence to support the jury's findings that Petitioner's murder of the victim "was carried out to

10   further the activities of the criminal street gang" and with "specific intent to promote, further, or

11   assist in any criminal conduct by gang members." *Villalobos*, 145 Cal.App.4th at 322.  The

12   California Court of Appeal held that evidence provided by the prosecution's gang expert was

13   sufficient to sustain the gang allegations against Petitioner.  (Lod. Doc. 4 at 31-32).  The

14   prosecution's gang expert Frolian Mariscal testified that

> [in] his opinion...the robbery and homicide of Lopez was a murder committed for the promotion and benefit of the DSSM gang. Mariscal testified the crimes benefited [Petitioner] because they helped him "by gaining him respect within his own gang and also respect in the eyes of fellow gang members. It also gains the gang respect by the further intimidation and fear that they instill upon the community by committing this type of crime." One of the primary activities of the Norteno gang was to intimidate witnesses. As a result of these crimes, "witnesses are reluctant to come forward and testify on this case or any other case involving gang members because of the fear of retaliation. So, in turn, [appellant] would be more likely to--well, it would be harder for us to convict [appellant] without witnesses coming forward." [Petitioner's] crimes would show the rival gangs "that the Nor Tenos are a gang to be reckoned with. It shows them they are capable of--of killing and they gain respect in the eyes of rival gang members."
>
> Mariscal explained Lopez's body was left in the apartment's parking lot, which was an area claimed by DSSM. "So what they're saying is--it's a bold statement saying: We can commit this type of crime in this area because this is ours, we control it, and there's nothing anybody can do about it." [Petitioner's] crimes also promoted further crimes committed by DSSM "by the intimidation that the crime inflicts on the community … or crimes in the future would. Also, probably people would be reluctant to come forward and speak with the police." Mariscal spoke to three other people at the apartment building, and they were all afraid  to give statements or testify.

27   (Lod. Doc. 4 at 21-22).

28   ///

Petitioner complains that expert testimony offered by the prosecution was insufficient as a matter of law to sustain his gang enhancements.  Petitioner cites a series of California cases in which courts held that the testimony offered by gang experts lacked evidentiary support.  (Pet. at 13-15). The California Court of Appeal correctly distinguished Petitioner's authorities:

> The instant case is distinguishable [from Petitioner's authorities], because there was an evidentiary basis for the expert's opinion testimony. Rick Lopez had the great misfortune to spend his final hours surrounded by Nortenos at the Davis house--Trevor, Daniel, and appellant. Appellant displayed an immediate interest in Lopez and asked Trevor about Lopez's truck and whether he had money. Appellant had earlier purchased a .380-caliber handgun from Daniel, his DSSM associate, and appellant displayed the weapon that night to Trevor. Appellant told Daniel that he was going to "jack" Lopez that night, that he was going to rob him, and appellant asked Lopez for a ride home. Neither Daniel nor Trevor tried to warn Lopez about appellant's possession of a gun and his intentions; indeed, Trevor had vouched for appellant earlier in the evening. Shannon saw Lopez and appellant leave together in Lopez's truck, with Lopez in the driver's side and appellant in the passenger side.
>
> The forensic and circumstantial evidence strongly implies that appellant directed Lopez to drive him to the Algen apartment complex, an area within DSSM's turf. Appellant shot Lopez twice in the head while they were still in the truck and dragged his body into the parking lot, without any apparent attempt to conceal the body or the evidence of the crime. The truck's interior was ransacked and the ashtray and some cigars were thrown in the apartment's parking lot, inferring that appellant ransacked the vehicle while he was still in the parking lot. At some point, he cut the wires and removed the stereo from Lopez's truck, drove away with Lopez's truck, drove back to that same parking lot, and dragged Lopez's body to another spot in the same parking lot--all at a location which had been tagged as DSSM turf and adjoining appellant's street, where he had personally tagged the neighborhood. Appellant escaped on foot by jumping over fences and picked up an accomplice at some point, but the record is silent as to that person's identity or what that accomplice might have done, aside from jumping over fences with appellant just after the murder.
>
> Just  hours after the murder, appellant confided his involvement to other DSSM associates, Perez and Anguiano, and tried to get rid of Lopez's stereo by giving it to Perez. Angela Crum had learned to fear appellant and her other neighbors because of their DSSM activities but kept asking appellant about the homicide. Appellant finally told her "'Mother fucker deserved it,'" but also told her to keep her mouth shut. Crum was present when he bragged to his girlfriend and her sister, who lived in the same neighborhood, that he was a murderer and there was nothing on him.
>
> In light of this evidence, Mariscal testified that a DSSM member's commission of violent crimes, and leaving a dead body in the midst of DSSM territory, would help that person gain respect within his own gang and among rival gang members, instill fear and intimidation on neighbors and potential witnesses, and expedite the commission of later crimes because of the fear and intimidation. Mariscal presented these opinions through an extensive hypothetical based upon the trial evidence...
>
> There is substantial evidence from which a rational trier of fact could find the gang allegations true in this case, and we see no basis on this record to second guess the jury's findings on these issues.

1  (Lod. Doc. 4 at 31-32).

2      Viewed in light of the evidence presented at trial, the California Court of Appeal's rejection

3  of Petitioner's insufficiency of the evidence claims was reasonable.  Mariscal's testimony constituted

4  evidence, albeit circumstantial, in support of the prosecution's gang allegations.  A rational juror

5  faced with Mariscal's testimony could find beyond a reasonable doubt that Petitioner's crime was

6  carried out to further the activities of the criminal street gang, as the prosecution's gang expert

7  testified that leaving the victims body exposed in the open was akin to sending a statement to the

8  community about the DSSM's control over the neighborhood; this testimony also provided an

9  evidentiary basis for the prosecutions claim that Petitioner's crime promoted, furthered, and/or

10  assisted in other criminal conduct by gang members.  CAL. PEN. CODE §190.2(a)(22); CAL. PEN.

11  CODE § 186.229(b)(1).   Because the Court cannot say that the California Court of Appeal's thorough

12  analysis and rejection of Petitioner's insufficiency of the evidence claim was objectively

13  unreasonable, Petitioner is not entitled to relief under the deferential AEDPA standard of review.

14      **B.  Fair Trial Claim**

15      Petitioner contends that the trial court erred in denying Petitioner's motion to bifurcate his

16  trial on the special gang circumstance and gang enhancement allegations.  (Pet. at 19).  Petitioner's

17  argument is based on his assertion that the gang evidence was irrelevant to the underlying offenses

18  and was unduly prejudicial.  (Id. at 22).  The California Court of Appeal identified the appropriate

19  standard of review for Petitioner's due process claim:

20          Only if there are no permissible inferences the jury may draw from the evidence can
           its admission violate due process. Even then, the evidence must "be of such quality as
21         necessarily prevents a fair trial." [Citation.] Only under such circumstances can it be
           inferred that the jury must have used the evidence for an improper purpose.'
22         [Citation.] 'The dispositive issue is … whether the trial court committed an error
           which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal
23         due process.

24  (Lod. Doc. 4 at 44) (quoting *People v. Albarran*, 149 Cal. App. 4th 214, 228-229 (Cal. Ct. Appl.

25  2007).

26      As noted by the Court of Appeal, the inquiry entailed by Petitioner's due process claim is not

27  whether introduction of the gang evidence violated state law evidentiary principles, but "whether the

28  trial court committed an error which rendered the trial so arbitrary and fundamentally unfair that it

violated due process." *E.g. Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). In light of the evidence presented against Petitioner at trial and the limiting instruction given to the jury, Petitioner cannot establish that the trial court's refusal to grant Petitioner's bifurcation motion rendered Petitioner's trial fundamentally unfair.

First, there were permissible inferences the jury could draw from the gang evidence offered against Petitioner with respect to his murder and robbery charges. The Court of Appeal correctly explained that:

> there was clearly sufficient evidence to link the murder and robbery to appellant's membership in the DSSM Norteno gang...nearly every fact about the robbery and murder had a strong connection to the DSSM and Norteno gang. Lopez was last seen alive surrounded by Norteno members Trevor, Daniel, and appellant, who displayed his gun to Trevor and confided his robbery intentions to Daniel. Lopez was murdered and his body dumped in an area claimed by DSSM. While the murder weapon was never found, the forensic evidence revealed the fatal bullets were Winchester .380 ammunition, which was usually seen in indoor ranges; the same type of ammunition was found secreted in the wall of appellant's house, and Daniel had just sold appellant a .380-caliber handgun. The gang aspect of this case was clearly intertwined with the underlying facts of the robbery and murder.

(Lod. Doc. 4 at 39). Because evidence of Petitioner's gang affiliation was relevant to several issues, including Petitioner's motive and opportunity to commit his crimes, the California Court of Appeal's determination that there were permissible inferences to be drawn from the gang evidence was not objectively unreasonable.

Second, any unfairness resulting from the admission of the gang evidence against Petitioner was presumably remedied by the limiting instruction given to the jury. The trial court instructed the jury as follows:

> You may consider evidence of gang activity only for the limited purpose of deciding whether:
> --The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related enhancements, and special circumstances allegations charged:
>
> OR
>
> --The defendant had a motive to commit the crime charged. You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion.
>
> You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime.

1 (Lod. Doc. 4 at 39-40).  The Court must presume that the jury complied with the trial court's limiting

2 instruction.  *E.g. United States v. Harris*, 211 F.2d 656, 659 (1954).

3          Finally, the Court notes that the evidence of Petitioner's guilt as to his murder and robbery

4 convictions was so overwhelming that any error in the admission of the gang evidence did not have a

5 substantial and injurious effect or influence in determining the jury's verdict.  *Brecht v. Abramson*,

6 507 U.S. 619, 637 (1995); *Fry v. Pliler*, 551 U.S. 112, 120 (2007).   According to testimony

7 adduced at Petitioner's trial, Petitioner told a friend he intended to rob the victim; the victim gave

8 Petitioner a ride home and wound up dead essentially in Petitioner's backyard; Petitioner brandished

9 a weapon of the same caliber used on the victim shortly before leaving with the victim in his car; a

10 rare type of ammunition used on the victim was found hidden at Petitioner's home; a shirt with the

11 victim's blood was found in a trash can in a room at Petitioner's residence that also contained

12 Petitioner's wallet and other personal property; Petitioner confessed to killing the victim to a fellow

13 gang member; Petitioner's neighbor saw Petitioner jumping over a fence adjacent to the crime scene

14 after she heard gunshots.  (Lod. Doc. 4 at 2-23).  In light of the powerful evidence of Petitioner's

15 guilt presented during trial, evidence of his gang affiliation could not have had a substantial and

16 injurious effect on the jury's verdict.  Accordingly, Petitioner is not entitled to relief.

17                                            **Recommendation**

18          This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United

19 States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of

20 the Local Rules of Practice for the United States District Court, Eastern District of California.

21 Within thirty (30) days after being served with a copy, any party may file written objections with the

22 court and serve a copy on all parties.  Such a document should be captioned "Objections to

23 Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and

24 filed within ten (10) court days (plus three days if served by mail) after service of the objections.

25 The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(c).

26 The parties are advised that failure to file objections within the specified time may waive the right to

27 appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

28

1    IT IS SO ORDERED.

2    **Dated:     March 31, 2010**              /s/ John M. Dixon
                                        UNITED STATES MAGISTRATE JUDGE

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28